COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-137-CV

 

 

IN THE INTEREST OF                                                                            



J.E.H.,
A CHILD

 

 

                                              ------------

 

            FROM
THE 393RD DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

Appellant Mary Catherine Fry
(AKatie@) appeals
the trial court=s order
terminating her parental rights to her son J.E.H.  We affirm.








In Katie=s first, second, and third points, she challenges the legal and
factual sufficiency of the evidence supporting the statutory grounds for
termination.  In proceedings to terminate
the parent‑child relationship, the State must establish one or more of
the grounds listed under Texas Family Code section 161.001(1) and must also
prove that termination is in the best interest of the child.[2]
 These elements must be
established by clear and convincing evidence,[3]
defined as the Ameasure or
degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@[4]  Although the two elements must
be proven independently, the same evidence may be probative of both issues.[5]


The jury found by clear and
convincing evidence that termination of the parent-child relationship between
Katie and J.E.H. was in J.E.H.=s best interest and that Katie had

$      
knowingly placed or knowingly allowed the child
to remain in conditions or surroundings which endangered the physical or
emotional well-being of the child; 

 

$      
engaged in conduct, or knowingly placed the child
with persons who engaged in conduct, which endangered the physical or emotional
well-being of the child; and

 








$      
failed to comply with the
provisions of a court order that specifically established the actions necessary
for the mother to obtain the return of the child who has been in the permanent
or temporary managing conservatorship of the Department of Family and
Protective Services for not less than nine months as a result of the child=s removal from the parent for abuse or neglect.[6]   

In accordance with the jury=s verdict, the trial court ordered termination based on these three
grounds and the best interest finding. 

The evidence
at trial showed as follows:

Katie began
using illegal drugs when she was fourteen. 
As a teenager, she used marijuana, methamphetamine, LSD, and cocaine
(sometimes intravenously); inhaled butane; and abused prescription pills.  She was also promiscuous as a teenager.  In her early twenties, Katie used heroin. 

J.E.H. was
born in June 2002, when Katie was twenty-four, and he was almost five years old
at the April 2007 trial.  At the time of
her son=s birth, Katie was romantically involved with J.E.H.=s father, Jeremy H., whom she met in Waco where she participated in a
drug rehabilitation program.  Katie
admitted that Jeremy had abused her at least three times, breaking her
collarbone in one incident in July 2001. 
Although Jeremy was sent to jail for assaulting her, Katie stayed in the
relationship after J.E.H. was born and took Jeremy back into their home when he
got out of prison.  Katie also smoked
marijuana and drank with Jeremy. 








Apparently
while Jeremy was in jail again, Katie lived with her mother, Jane Fry, held a
job, and in May 2004 graduated from a junior college with a 4.0 grade point
average.  The relationship with Jeremy
ended in October 2004, and in the spring of 2005 Katie met and moved in with
Jamon Hestand, a convicted murderer. 
Although Katie claimed to be unaware of Hestand=s criminal history at the time, she admitted to using methamphetamine
with him during the relationship and to burglarizing an apartment together in
April 2005.[7]  After committing the burglary, Katie took
J.E.H. to Kansas and, when arrested there in July 2005, fought extradition back
to Texas.  She ultimately returned to
Texas, spent a few months in jail, and was placed on probation for eight years
for the burglary.  Although the
relationship with Hestand ended in April 2005, Katie visited him in jail in
April, May, and December 2005 because she wanted to continue the friendship. 








Meanwhile,
Katie=s mother Jane traveled from Texas to Kansas to retrieve J.E.H.
immediately after Katie=s July 2005
arrest.  Jane began to care for J.E.H.
but was unsure whether she could keep him due to the financial strain.  Therefore, in August and September 2005, she
asked family members for help unsuccessfully and spoke with Michelle Hiza, a
CPS investigator, about assistance. 

In September
2005, Jane had considerable difficulty deciding whether to keep J.E.H.  On September 6, Jane wrote a statement
relinquishing J.E.H. to the State because of Aday care and medical expenses,@ but she changed her mind the following day.  On September 26, she contacted Hiza and
indicated that she was committed to keeping J.E.H.  CPS decided to close the case, finding no
problem with Jane=s home.  However, on September 30, Jane wrote another
statement relinquishing J.E.H. and dropped J.E.H. and all his belongings at the
CPS office, again citing financial reasons.[8]  On October 5, 2005, Jane wrote a letter to
Hiza checking on J.E.H., but not indicating that she wanted him back. 








Katie was
released from jail in early December 2005, and by all accounts she appeared to
make a strong start on her court-ordered service plan.  She submitted to a psychological evaluation
and passed several drug tests.[9]  Further, she attended counseling regularly
and went to AA and NA meetings, although she did not initially participate in
the Asteps@ because she
did not feel that she had a drug problem. 
Katie also visited J.E.H. on a regular basis, got a job, and eventually
found housing where she lived on her own. 

In June
2006, Katie was participating in ten of eleven court-ordered services.  Her caseworker also noted progress in July,
August, and September 2006.  Although
both of her therapists saw some progress, one of the therapists and the
caseworker cautioned that Katie minimized or denied her substance abuse
problems and had difficulty acknowledging her role in J.E.H.=s removal.  Further, J.E.H.=s guardian ad litem noticed that during supervised visitation Katie
did not correct J.E.H.=s
misbehavior and aggressive behavior, and she became angry when appropriate
modifications were suggested. 

        Nevertheless,
by summer 2006, the State was considering a Areturn and monitor,@ by which J.E.H. would be returned to Katie and a caseworker would
visit once a week.  The State also sought
and was granted a six-month extension of the one-year dismissal deadline in
order to give Katie more time.  Although
the State=s stated Agoal@ since March
2006 remained termination, the caseworker testified that reunification was
always possible and remained the State=s primary objective. 








In the fall
of 2006, however, Katie=s progress
abruptly halted.  She Adrank heavily@ in
September and October 2006 and, after being arrested for DWI in October 2006,
used marijuana, mushrooms, and methadone pills (without a prescription).[10]  The DWI on October 13, 2006, involved Katie=s hitting a pedestrian with the mirror of her car, crashing into
another vehicle and leaving the scene, and finally hitting a third
vehicle.  After the DWI, Katie entered
drug rehabilitation but left the program early, and she ceased visiting J.E.H.,
making child support payments, and attending counseling.  The State revoked Katie=s burglary probation, and at the time of trial she was serving a
two-year sentence for that offense. 
Katie also later admitted that she had smoked marijuana in June 2006. 

Jane was an
intervenor in the trial court and had actually intervened in the case
twice.  First, immediately after
relinquishing J.E.H., she intervened in October 2005 but obtained a dismissal
of her suit without prejudice several weeks later.  Less than two weeks before trial, Jane
intervened again. 








J.E.H. lived
with the same foster family from October 25, 2005, through April 2007.  The foster mother testified that J.E.H. had
anger, aggression, abandonment, and anxiety issues when he arrived, but these
problems had generally improved after a few months.[11]  The foster family, which consisted of a
husband, wife, and two daughters, wanted to adopt J.E.H.  J.E.H.=s guardian ad litem testified that termination and adoption by the
foster family were in J.E.H.=s best interest, and the State and J.E.H.=s attorney ad litem both argued for those results as well.

Katie and
Jane, on the other hand, asked the jury to place J.E.H. with Jane and appoint
her managing conservator.  They planned
that Jane would care for J.E.H. while Katie was in prison and for several years
after her release, until Katie became sufficiently independent and J.E.H.
turned fifteen.  Jane maintained that she
would call the police on her daughter if necessary to prevent her
interference.  Further, Jane=s brother (a pastor), his wife, and their adult daughter testified
that they would support Jane as needed and help her raise J.E.H., including
giving Jane monthly financial support and helping her with child care.  There was also evidence, however, that in her
own childhood Katie had been Ayo-yoed@ between her
mother and father=s homes, and
that the arrangement had been very difficult for her.   








Following a
four-day trial, the jury answered Ayes@ to the
three statutory grounds and found that termination of the parent-child
relationship between Katie and J.E.H. was in J.E.H.=s best interest.  The jury also
found that the State, rather than Jane, should be named J.E.H.=s permanent managing conservator. 
In accordance with these findings, the trial court terminated Katie=s parent-child relationship with J.E.H. and named the State as J.E.H.=s permanent managing conservator.[12]


We may
affirm the trial court=s judgment
if we find the evidence sufficient to support any statutory ground relied on by
the trial court and that termination is in the best interest of the child.[13]  We first consider whether the evidence is
legally and factually sufficient to support the trial court=s finding on ground (E), that Katie engaged in conduct or knowingly
placed the child with persons who engaged in conduct that endangered J.E.H.=s physical or emotional well-being.[14]









AEndanger@ under this
subsection means to expose to loss or injury, to jeopardize.[15]  The term means more than a threat of Ametaphysical injury,@ but it is not necessary that the conduct be directed at the child or
that the child actually suffer injury.[16]  Nevertheless, there must be evidence of
endangerment to the child=s physical
or emotional well‑being as the direct result of the parent=s conduct.[17]

Drug
addiction and its effect on a parent=s life and ability to parent may establish an endangering course of
conduct.[18]  Further, a parent=s history of alcohol abuse may also be evidence of endangering
conduct.[19]  The jury could properly look to Katie=s acts both before and after J.E.H.=s birth.[20]  








The evidence
showed that Katie experienced a recurring problem with illegal drugs and
alcohol from age fourteen to the time of trial, when she was twenty-nine years
old.  Despite at least two previous
attempts at drug rehabilitation, incarceration, probation, and counseling,
Katie admitted that she used illegal drugs, Adrank heavily,@ and drove
while intoxicated during the pendency of the termination case.  The jury could have inferred from Katie=s past drug use and alcohol abuse that similar conduct would recur if
J.E.H. were returned to her.[21]

A parent=s criminal history and imprisonment are other factors that are
properly considered on the issue of endangerment.[22]  An environment that routinely subjects a
child to the probability that he will be left alone because his mother is
jailed, whether because of probation violations or a new offense, endangers
both the physical and emotional well-being of a child.[23]  The evidence showed that Katie repeatedly
used illegal drugs, had been convicted both for resisting arrest and burglary,
and drove while intoxicated.  Because of
her actions, her probation was revoked, and at the time of trial she was serving
a two-year sentence for burglary.  The
jury could have found that these circumstances endangered J.E.H.








Having
carefully considered the evidence and applying the appropriate factual
sufficiency standard of review,[24]
we hold that, on the entire record, the jury could have reasonably formed a
firm belief or conviction that Katie engaged in conduct that endangered the
physical or emotional well-being of J.E.H. 
Thus, the evidence was factually sufficient to support the court=s finding under family code section 161.001(1)(E).  Although Katie=s legal sufficiency complaint regarding this finding was not
specifically presented in her timely-filed statement of points,[25]
because the evidence is factually sufficient to support the finding, it is
necessarily legally sufficient as well.[26]  Accordingly, we overrule Katie=s second point.[27]








In her
fourth point, Katie contends that the evidence was legally and factually insufficient
to support the trial court=s finding that termination of the parent-child relationship between
Katie and J.E.H. was in J.E.H.=s best interest.  Nonexclusive
factors that the trier of fact in a termination case may use in determining the
best interest of the child include the following:

(1)    the desires of the child;

 

(2)    the emotional and physical needs of the child now and in the
future; 

 

(3)    the emotional and physical danger to the child now and in the
future; 

 

(4)    the parental abilities of the individuals seeking custody; 

 

(5)    the programs available to assist these individuals to promote the
best interest of the child;

 

(6)    the plans for the child by these individuals or by the agency
seeking custody;

 

(7)    the stability of the home or proposed placement;

 

(8)    the acts or omissions of the parent which may indicate that the
existing parent‑child relationship is not a proper one; and

 

(9)    any excuse for the acts or omissions of the parent.[28]


 








These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other factors
not on the list may also be considered when appropriate.[29]   Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.[30]  On the other hand, the presence of scant
evidence relevant to each Holley factor will not support such a finding.[31]









In this
case, all of the Holley factors support a finding that termination of
the parent-child relationship was in J.E.H.=s best interest.  Based on Katie=s acts and omissions detailed above, the jury could have concluded
that J.E.H. was in emotional and physical danger while in Katie=s custody, that his emotional and physical needs were not being met,
that her parenting abilities were extremely poor, and that the existing parent-child
relationship was not proper.[32]  Again, the jury could have inferred from
Katie=s past conduct that similar conduct would recur if J.E.H. were
returned to her.[33]  

Further,
although Jane met J.E.H.=s needs for
a short time, in a one-month time period she decided that she could not care
for him, changed her mind, and finally surrendered him again.  The jury could have concluded that the State
and the foster family would provide a more stable home for J.E.H. and had
preferable plans for his future.[34]  

Katie
participated in many court-ordered programs to help her get J.E.H. back, and
she had also participated in drug rehabilitation at least twice in the
past.  Her continued use of illegal drugs
and alcohol in June, September, and October 2006, and her abrupt stop to
counseling and visitation, however, demonstrate that she did not successfully
overcome her substance abuse problems and did not fully comply with her family
service plan.[35]









Although
there was no direct evidence of J.E.H.=s desires, his guardian ad litem testified that he had told her what
he wanted to happen in the case.  J.E.H.=s words were not admitted into evidence because of a hearsay
objection, but the guardian ad litem recommended that termination would be in
J.E.H.=s best interest. 

Katie blamed
her fall 2006 relapse on her frustration with the State; she felt that she had done
everything that was asked of her and that J.E.H. should have been returned to
her earlier.  However, she also admitted
that she had used marijuana in June 2006 and, when she drank heavily in
September and October 2006, she had known that she was violating her probation
and could go to jail for ten years.  We
are not willing to accept her frustration with the State as a valid excuse for
these acts.[36]









Having
carefully considered the evidence in light of the Holley factors and
applying the appropriate factual sufficiency standard of review,[37]
we hold that the jury could have reasonably formed a firm belief or conviction
that termination was in the best interest of J.E.H., and the evidence is
factually sufficient to support that finding. 
Again, although Katie=s legal sufficiency challenge to this finding was not specifically
presented in her statement of points, because the evidence is factually
sufficient, it is necessarily legally sufficient as well.[38]  Accordingly, we overrule Katie=s fourth point. 

Having
overruled Katie=s second and
fourth points, which are dispositive of her appeal, we affirm the trial court=s judgment.

 

PER CURIAM

 

PANEL F:  CAYCE, C.J.; GARDNER
and WALKER, JJ.

 

DELIVERED:  February 21, 2008                            











[1]See Tex. R. App. P. 47.4.





[2]Tex. Fam. Code Ann. '
161.001 (Vernon 2002 & Supp. 2007); In re J.L., 163 S.W.3d 79, 84
(Tex. 2005).





[3]Tex. Fam. Code Ann. ''
161.001, .206(a) (Vernon 2002 & Supp. 2007); In re J.F.C., 96 S.W.3d
256, 263 (Tex. 2002).





[4]Tex. Fam. Code Ann. '
101.007 (Vernon 2002).





[5]In re
C.H., 89 S.W.3d 17, 28 (Tex. 2002).





[6]See Tex. Fam. Code Ann. '
161.001(1)(D), (E), (O).   





[7]The
Texas Department of Family and Protective Services (Athe
State@)
became involved with J.E.H. in April 2005 when he was left at day care after
hours. 





[8]Jane
testified that another reason she surrendered J.E.H. on September 30 was that
she had injured her back lifting him. 





[9]Katie
was not initially forthcoming about past domestic violence, however, and she
was dishonest about her drug use. 





[10]Katie
blamed this relapse on frustration with the State. 





[11]His
behavior, however, had worsened in the weeks preceding the trial, apparently
because of anxiety over the outcome of the trial. 





[12]The
trial court had previously terminated J.E.H.=s father=s
rights by interlocutory order on March 27, 2007.  





[13]In re
A.V., 113 S.W.3d 355, 362 (Tex. 2003); In re N.R., 101 S.W.3d 771,
775 (Tex. App.CTexarkana
2003, no pet.). 





[14]See Tex. Fam. Code Ann. '
161.001(1)(E).





[15]Tex.
Dep=t of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.M.,
58 S.W.3d 801, 811 (Tex. App.CFort Worth 2001, no pet.). 





[16]Boyd, 727
S.W.2d at 533; D.M., 58 S.W.3d at 811. 





[17]D.M., 58
S.W.3d at 811B12;
In re R.D., 955 S.W.2d 364, 368 (Tex. App.CSan
Antonio 1997, pet. denied).





[18]In re
U.P., 105 S.W.3d 222, 234 (Tex. App.CHouston [14th Dist.] 2003,
pet. denied).





[19]See,
e.g., In re R.W., 129 S.W.3d 732, 741 (Tex. App.CFort
Worth 2004, pet. denied).





[20]See
D.M., 58 S.W.3d 801 at 812. 





[21]See
In re J.D.B., No. 02-06-00451-CV, 2007 WL 2216612, at *3
(Tex. App.CFort
Worth Aug. 2, 2007, no pet.) (mem. op.); In re C.S.C., No.
02-06-00254-CV, 2006 WL 3438185, at *7 (Tex. App.CFort
Worth Nov. 30, 2006, no pet.) (mem. op.).





[22]R.W., 129
S.W.3d at 743; Dupree v. Tex. Dep=t of Protective &
Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).





[23]In re
S.D., 980 S.W.2d 758, 763 (Tex. App.CSan Antonio 1998, pet.
denied).





[24]See
C.H., 89 S.W.3d at 25.





[25]Tex. Fam. Code Ann. '
263.405(i) (Vernon Supp. 2007).





[26]See
In re D.S.A., 113 S.W.3d 567, 569 (Tex. App.CAmarillo
2003, no pet.) (stating that Aif the evidence is factually
sufficient, then, it is also legally sufficient.  This is so because, logically, there cannot
be >no
evidence= of
record if the record contains enough evidence to enable the factfinder to
reasonably form a firm belief or conviction as to the existence of pivotal
facts.@).





[27]Because
we find sufficient evidence to support a finding under section (E), we need not
address Katie=s
first and third points challenging the sufficiency of the evidence under
sections (D) and (O).  See N.R.,
101 S.W.3d at 775.





[28]Holley
v. Adams, 544 S.W.2d 367, 371B72
(Tex. 1976).  





[29]C.H., 89
S.W.3d at 27.





[30]Id.  





[31]Id. 





[32]See,
e.g., In re D.S., 176 S.W.3d 873, 879 (Tex. App.CFort
Worth 2005, no pet.) (holding that evidence of a parent=s
long‑term drug use can support a fact‑finder=s
conclusion that termination is in the child=s best interest), superseded
by statute on other grounds as recognized in In re D.A.R., 201 S.W.3d 229,
230B31
& n.1 (Tex. App.CFort
Worth 2006, no pet.); In re C.A.J., 122 S.W.3d 888, 893B94
(Tex. App.CFort
Worth 2003, no pet.) (noting that a parent=s continuous drug use poses
an emotional and physical danger to a child now and in the future); In re
J.R., 991 S.W.2d 318, 322 (Tex. App.CFort Worth 1999, no pet.)
(noting evidence of abuse and neglect included children=s
exposure to domestic violence).





[33]See
C.S.C., 2006 WL 3438185, at *7.





[34]Evidence
about placement plans and adoption are relevant to best interest, but the lack
of evidence about definitive plans for permanent placement is not
dispositive.  C.H., 89 S.W.3d at
28.





[35]See
In re S.B., 207 S.W.3d 877, 887B88
(Tex. App.CFort
Worth 2006, no pet.) (holding that evidence of a parent=s
failure to comply with her family service plan supports a finding that
termination is in the best interest of the child).





[36]Cf.
C.S.C., 2006 WL 3438185, at *9 (noting that appellant=s own
actions caused her to be put in detention centers and hospitals and therefore
not complete her service plan).





[37]See
C.H., 89 S.W.3d at 25. 





[38]See
supra notes 25B26.