COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-07-137-CV

IN THE INTEREST OF 

J.E.H., A CHILD

------------

FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant Mary Catherine Fry (“Katie”) appeals the trial court’s order terminating her parental rights to her son J.E.H.  [ant br @ 2-3; CR 60]  We affirm.

In Katie’s first, second, and third points, she challenges the legal and factual sufficiency of the evidence supporting the statutory grounds for termination.  [ant br @ 3]  
In proceedings to terminate the parent-child relationship, the State must establish one or more of the grounds listed under Texas Family Code section 161.001(1) and must also prove that termination is in the best interest of the child.
(footnote: 2) 
 
These elements must be established by clear and convincing evidence,
(footnote: 3) defined as the
 “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”
(footnote: 4)  Although the two elements must be proven independently
, the same evidence may be probative of both issues.
(footnote: 5) 

The jury found by clear and convincing evidence that termination of the parent-child relationship between Katie and J.E.H. was in J.E.H.’s best interest and that Katie had

knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; 

engaged in conduct, or knowingly placed the child with persons who engaged in conduct, which endangered the physical or emotional well-being of the child; and

failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child’s removal from the parent for abuse or neglect.
(footnote: 6)  [CR 508, 482-484]  

In accordance with the jury’s verdict, the trial court ordered termination based on these three grounds and the best interest finding.  [CR 508]

The evidence at trial showed as follows:

Katie began using illegal drugs when she was fourteen.  [RR 2:160-164]  As a teenager, she used marijuana, methamphetamine, LSD, and cocaine (sometimes intravenously); inhaled butane; and abused prescription pills.  [RR 2:160-164]  She was also promiscuous as a teenager.  [RR 2:164]  In her early twenties, Katie used heroin.  [RR 3:14]

J.E.H. was born in June 2002, when Katie was twenty-four, and he was almost five years old at the April 2007 trial.  [RR 2:151-152, 1:4]  At the time of her son’s birth, Katie was romantically involved with J.E.H.’s father, Jeremy H., whom she met in Waco where she participated in a drug rehabilitation program.  [RR 2:168-169, 151-152, 172]  Katie admitted that Jeremy had abused her at least three times, breaking her collarbone in one incident in July 2001.  [RR 2:153-154; 3:205]  Although Jeremy was sent to jail for assaulting her, Katie stayed in the relationship after J.E.H. was born and took Jeremy back into their home when he got out of prison.  [RR 3:277; 2:170-171, 277]   Katie also smoked marijuana and drank with Jeremy.  [RR 2:157-158] 

Apparently while Jeremy was in jail again, Katie lived with her mother, Jane Fry, held a job, and in May 2004 graduated from a junior college with a 4.0 grade point average.  [3:50, rx1-3, 3:278]  The relationship with Jeremy ended in October 2004, and in the spring of 2005 Katie met and moved in with Jamon Hestand, a convicted murderer.  [RR 3:279-280, 2:171, 175-177]  Although Katie claimed to be unaware of Hestand’s criminal history at the time, she admitted to using methamphetamine with him during the relationship and to burglarizing an apartment together in April 2005.
(footnote: 7)  [RR 2:175-179, 186-187]  After committing the burglary, Katie took J.E.H. to Kansas and, when arrested there in July 2005, fought extradition back to Texas.  [RR 2:182-184, 189]  She ultimately returned to Texas, spent a few months in jail, and was placed on probation for eight years for the burglary.  [RR 2:190, 179]  Although the relationship with Hestand ended in April 2005, Katie visited him in jail in April, May, and December 2005 because she wanted to continue the friendship.  [RR 2:188-190]

Meanwhile, Katie’s mother Jane traveled from Texas to Kansas to retrieve J.E.H. immediately after Katie’s July 2005 arrest.  [RR 2:183-185, 3:288-289]  Jane began to care for J.E.H. but was unsure whether she could keep him due to the financial strain.  [RR 3:290-291]  Therefore, in August and September 2005, she asked family members for help unsuccessfully and spoke with Michelle Hiza, a CPS investigator, about assistance.  [RR 3:290-292; 4:105-107]  

In September 2005, Jane had considerable difficulty deciding whether to keep J.E.H.  On September 6, Jane wrote a statement relinquishing J.E.H. to the State because of “day care and medical expenses,” but she changed her mind the following day.  [RR 3:293-294, 4:109-110; px 12]  On September 26, she contacted Hiza and indicated that she was committed to keeping J.E.H.  [RR 3:295; 4:110-111]  CPS decided to close the case, finding no problem with Jane’s home.  [RR 4:110-111, 123-124]  However, on September 30, Jane wrote another statement relinquishing J.E.H. and dropped J.E.H. and all his belongings at the CPS office, again citing financial reasons.
(footnote: 8)  [RR 3:3:295-96, px 13]  On October 5, 2005, Jane wrote a letter to Hiza checking on J.E.H., but not indicating that she wanted him back.  [px 14]

Katie was released from jail in early December 2005, and by all accounts she appeared to make a strong start on her court-ordered service plan.  [RR 2:189-192, 4:227]  She submitted to a psychological evaluation and passed several drug tests.
(footnote: 9)  [RR 3:199, 4:229, 259-266; rx 18, 19; 4:273-274]  Further, she attended counseling regularly and went to AA and NA meetings, although she did not initially participate in the “steps” because she did not feel that she had a drug problem.  [RR 4:236-237]  Katie also visited J.E.H. on a regular basis, [RR 2:268] got a job, and eventually found housing where she lived on her own.  [px 7, 4:228-230, 178-180, 168]  

In June 2006, Katie was participating in ten of eleven court-ordered services.  [RR 4:156-157; rx 16]  Her caseworker also noted progress in July, August, and September 2006.  [rx23,24,25, 4:289]  Although both of her therapists saw some progress [RR 3:164; 4:171-173, 180], one of the therapists and the caseworker cautioned that Katie minimized or denied her substance abuse problems and had difficulty acknowledging her role in J.E.H.’s removal.   [RR 4:299, 229-230; 3:165-167, 155, 4:287-288]  Further, J.E.H.’s guardian ad litem noticed that during supervised visitation Katie did not correct J.E.H.’s misbehavior and aggressive behavior, and she became angry when appropriate modifications were suggested.  [RR 4:143-145]

   Nevertheless, by summer 2006, the State was considering a “return and monitor,” by which J.E.H. would be returned to Katie and a caseworker would visit once a week.  [4:293, 245]  The State also sought and was granted a six-month extension of the one-year dismissal deadline in order to give Katie more time.  [RR 2:204, 4:139]  Although the State’s stated “goal” since March 2006 remained termination, the caseworker testified that reunification was always possible and remained the State’s primary objective.  [RR 4:298-299, 158, 271]

In the fall of 2006, however, Katie’s progress abruptly halted.  She “drank heavily” in September and October 2006 and, after being arrested for DWI in October 2006, used marijuana, mushrooms, and methadone pills (without a prescription).
(footnote: 10)  [RR 2:197, 208]  The DWI on October 13, 2006, involved Katie’s hitting a pedestrian with the mirror of her car, crashing into another vehicle and leaving the scene, and finally hitting a third vehicle.  [RR 2:205-208, 4:243]  After the DWI, Katie entered drug rehabilitation but left the program early, and she ceased visiting J.E.H., making child support payments, and attending counseling.  [px31,p.3]  The State revoked Katie’s burglary probation, and at the time of trial she was serving a two-year sentence for that offense.  [RR 2:196-197]  Katie also later admitted that she had smoked marijuana in June 2006.  [RR 3:8, 101; 4:78, 140, 241, 302]

Jane was an intervenor in the trial court and had actually intervened in the case twice.  [RR 1:2, 3:300-301, px 29, 30; 3:304-305]  First, immediately after relinquishing J.E.H., she intervened in October 2005 but obtained a dismissal of her suit without prejudice several weeks later.  [CR 23, 35, px 29,30; 3:300-301]  Less than two weeks before trial, Jane intervened again.  [CR 169; 3:304-305] 

J.E.H. lived with the same foster family from October 25, 2005, through April 2007.  [RR 3:233, 237]  The foster mother testified that J.E.H. had anger, aggression, abandonment, and anxiety issues when he arrived, but these problems had generally improved after a few months.
(footnote: 11)  [RR 3:233-235]  The foster family, which consisted of a husband, wife, and two daughters, wanted to adopt J.E.H.  [RR 3:245, 232-233; px 20, 3:248-249]  J.E.H.’s guardian ad litem testified that termination and adoption by the foster family were in J.E.H.’s best interest, and the State and J.E.H.’s attorney ad litem both argued for those results as well. [RR 5:26-28, 33-34; 4:133-135, 149-151]  

Katie and Jane, on the other hand, asked the jury to place J.E.H. with Jane and appoint her managing conservator.  [RR 5:14-21; 2:66, 4:88]  They planned that Jane would care for J.E.H. while Katie was in prison and for several years after her release, until Katie became sufficiently independent and J.E.H. turned fifteen.  [RR 4:77, 54]  Jane maintained that she would call the police on her daughter if necessary to prevent her interference.  [RR 4:54]  Further, Jane’s brother (a pastor), his wife, and their adult daughter testified that they would support Jane as needed and help her raise J.E.H., including giving Jane monthly financial support and helping her with child care.  [RR 3:129-134, 4:315-317]  There was also evidence, however, that in her own childhood Katie had been “yo-yoed” between her mother and father’s homes, and that the arrangement had been very difficult for her.  [RR 3:184]  

Following a four-day trial, the jury answered “yes” to the three statutory grounds and found that termination of the parent-child relationship between Katie and J.E.H. was in J.E.H.’s best interest.  [CR 482-485]  The jury also found that the State, rather than Jane, should be named J.E.H.’s permanent managing conservator.  [CR 489]  
In accordance with these findings, the trial court terminated Katie’s parent-child relationship with J.E.H. and named the State as J.E.H.’s permanent managing conservator.
(footnote: 12)  [CR 508-509]

We may affirm the trial court’s judgment if we find the evidence sufficient to support any statutory ground relied on by the trial court and that termination is in the best interest of the child.
(footnote: 13)  We first consider whether the evidence is legally and factually sufficient to support the trial court’s finding on ground (E), that Katie engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered J.E.H.’s physical or emotional well-being.
(footnote: 14)  [CR 508]

“Endanger” under this subsection means to expose to loss or injury, to jeopardize.
(footnote: 15)  The term means more than a threat of “metaphysical injury,” but it is not necessary that the conduct be directed at the child or that the child actually suffer injury.
(footnote: 16)  Nevertheless, there must be evidence of endangerment to the child’s physical or emotional well-being as the direct result of the parent’s conduct.
(footnote: 17)
 Drug addiction and its effect on a parent’s life and ability to parent may establish an endangering course of conduct.
(footnote: 18)  Further, a parent’s history of alcohol abuse may also be evidence of endangering conduct.
(footnote: 19)  The jury could properly look to Katie’s acts both before and after J.E.H.’s birth.
(footnote: 20)  

The evidence showed that Katie experienced a recurring problem with illegal drugs and alcohol from age fourteen to the time of trial, when she was twenty-nine years old.  [RR 2:151]  Despite at least two previous attempts at drug rehabilitation, incarceration, probation, and counseling, Katie admitted that she used illegal drugs, “drank heavily,” and drove while intoxicated during the pendency of the termination case.  [RR 2:166-168, 197, 208]  The jury could have inferred from Katie’s past drug use and alcohol abuse that similar conduct would recur if J.E.H. were returned to her.
(footnote: 21)
 A parent’s criminal history and imprisonment are other factors that are properly considered on the issue of endangerment.
(footnote: 22)  An environment that routinely subjects a child to the probability that he will be left alone because his mother is jailed, whether because of probation violations or a new offense, endangers both the physical and emotional well-being of a child.
(footnote: 23)  The evidence showed that Katie repeatedly used illegal drugs, had been convicted both for resisting arrest and burglary, and drove while intoxicated.  [RR 2:160, 179, 169, 205-207; 3:14]  Because of her actions, her probation was revoked, and at the time of trial she was serving a two-year sentence for burglary.  [RR 2:196-197]  The jury could have found that these circumstances endangered J.E.H.

Having carefully considered the evidence and applying the appropriate factual sufficiency standard of review,
(footnote: 24) we hold that, on the entire record, the jury could have reasonably formed a firm belief or conviction that Katie engaged in conduct 
that endangered the physical or emotional well-being of J.E.H.  Thus, 
the evidence was factually sufficient to support the court’s finding under family code section 161.001(1)(E).  Although Katie’s legal sufficiency complaint regarding this finding was not specifically presented in her timely-filed statement of points,
(footnote: 25) because the evidence is factually sufficient to support the finding, it is necessarily legally sufficient as well.
(footnote: 26)  [CR 520-521
]  Accordingly, we overrule Katie’s second point.
(footnote: 27)
 In her fourth point, Katie contends that the evidence was legally and factually insufficient to support the trial court’s finding that termination of the parent-child relationship between Katie and J.E.H. was in J.E.H.’s best interest.  Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the following:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future; 

(3) the emotional and physical danger to the child now and in the future; 

(4) the parental abilities of the individuals seeking custody; 

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.
(footnote: 28) 

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.
(footnote: 29) 
  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.
(footnote: 30)  
On the other hand, the presence of scant evidence relevant to each 
Holley
 factor will not support such a finding.
(footnote: 31) 

In this case, all of the 
Holley
 factors support a finding that termination of the parent-child relationship was in J.E.H.’s best interest.  Based on Katie’s acts and omissions detailed above, the jury could have concluded that J.E.H. was in emotional and physical danger while in Katie’s custody, that his emotional and physical needs were not being met, that her parenting abilities were extremely poor, and that the existing parent-child relationship was not proper.
(footnote: 32)  Again, the jury could have inferred from Katie’s past conduct that similar conduct would recur if J.E.H. were returned to her.
(footnote: 33)  

Further, although Jane met J.E.H.’s needs for a short time, in a one-month time period she decided that she could not care for him, changed her mind, and finally surrendered him again.  The jury could have concluded that the State and the foster family would provide a more stable home for J.E.H. and had preferable plans for his future.
(footnote: 34)  

Katie participated in many court-ordered programs to help her get J.E.H. back, and she had also participated in drug rehabilitation at least twice in the past.  [RR 2:168-169].  Her continued use of illegal drugs and alcohol in June, September, and October 2006, and her abrupt stop to counseling and visitation, however, demonstrate that she did not successfully overcome her substance abuse problems and did not fully comply with her family service plan.
(footnote: 35) 

Although there was no direct evidence of J.E.H.’s desires, his guardian ad litem testified that he had told her what he wanted to happen in the case.  [RR 4:147-150]  J.E.H.’s words were not admitted into evidence because of a hearsay objection, but the guardian ad litem recommended that termination would be in J.E.H.’s best interest.  [RR 4:147-150, px 31]

Katie blamed her fall 2006 relapse on her frustration with the State; she felt that she had done everything that was asked of her and that J.E.H. should have been returned to her earlier.  [2:210]  However, she also admitted that she had used marijuana in June 2006 and, when she drank heavily in September and October 2006, she had known that she was violating her probation and could go to jail for ten years.  [RR 2:206-208]  We are not willing to accept her frustration with the State as a valid excuse for these acts.
(footnote: 36) 

Having carefully considered the evidence in light of
 the 
Holley
 factors
 and applying the appropriate factual sufficiency standard of review,
(footnote: 37) we hold that the jury could have reasonably formed a firm belief or conviction that termination was in the best interest of J.E.H., and the evidence is factually sufficient to support that finding.  
Again, although Katie’s legal sufficiency challenge to this finding was not specifically presented in her statement of points, because the evidence is factually sufficient, it is necessarily legally sufficient as well.
(footnote: 38)  [CR 520-521] 
 
Accordingly, we overrule Katie’s fourth point. 

Having overruled Katie’s second and fourth points, which are dispositive of her appeal, we affirm the trial court’s judgment.

PER CURIAM

PANEL F:  CAYCE, C.J.; GARDNER and WALKER, JJ.

DELIVERED:  February __, 2008 
 

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Tex. Fam. Code Ann.
 § 161.001
 (Vernon 2002 & Supp. 2006); 
In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).

3:
Tex. Fam. Code Ann.
 §§ 161.001, .206(a) (Vernon 2002 & Supp. 2006); 
In re J.F.C.
, 96 S.W.3d 256, 263 (Tex. 2002)
.

4:
Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).

5:
In re C.H.
, 89 S.W.3d 17, 28 (Tex. 2002).

6:
See
 Tex. Fam. Code Ann.
 § 161.001(1)(D), (E), (O).   

7:
The Texas Department of Family and Protective Services (“the State”) became involved with J.E.H. in April 2005 when he was left at day care after hours.  [RR 4:27, 102-103]

8:
Jane testified that another reason she surrendered J.E.H. on September 30 was that she had injured her back lifting him.  [RR 3:295-296]

9:
Katie was not initially forthcoming about past domestic violence, however, and she was dishonest about her drug use.  [RR 3:205-206; 4:229-230]

10:
Katie blamed this relapse on frustration with the State.  [RR 3:26, 83, 103, 112, 4:189] 

11:
His behavior, however, had worsened in the weeks preceding the trial, apparently because of anxiety over the outcome of the trial.  [RR 3:247-248]

12:
The trial court had previously terminated J.E.H.’s father’s rights by interlocutory order on March 27, 2007.  [CR 471-473] 

13:
In re A.V.
, 113 S.W.3d 355, 362 (Tex. 2003);
 In re N.R.
, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.). 

14:
See
 Tex. Fam. Code Ann.
 § 161.001(1)(E).

15:
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987);
 In re D.M.
, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). 

16:
Boyd
, 727 S.W.2d at 533; 
D.M.
, 58 S.W.3d at 811.
 

17:
D.M.
, 58 S.W.3d at 811–12;
 In re R.D.
, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied).

18:
In re U.P.
, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

19:
See, e.g.
, 
In re R.W.
, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied).

20:
See D.M.
, 58 S.W.3d 801 at 812. 

21:
See In re J.D.B.
, No. 02-06-00451-CV, 2007 WL 2216612, at *3 (Tex. App.—Fort Worth Aug. 2, 2007, no pet.) (mem. op.); 
In re C.S.C.
, No. 02-06-00254-CV, 2006 WL 3438185, at *7 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.).

22:
R.W.
, 129 S.W.3d at 743; 
Dupree v. Tex. Dep’t of Prot. & Regulatory Servs.
, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

23:
In re S.D.
, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

24:
See 
C.H.
, 89 S.W.3d at 25.

25:
Tex. Fam. Code Ann.
 § 263.405(i) (Vernon 2002 & Supp. 2007).

26:
See In re D.S.A.
, 113 S.W.3d 567, 569 (Tex. App.—Amarillo 2003, no pet.) (stating that “if the evidence is factually sufficient, then, it is also legally sufficient.  This is so because, logically, there cannot be ‘no evidence’ of record if the record contains enough evidence to enable the factfinder to reasonably form a firm belief or conviction as to the existence of pivotal facts.”).

27:
Because we find sufficient evidence to support a finding under section (E), we need not address Katie’s first and third points challenging the sufficiency of the evidence under sections (D) and (O).  
See N.R.
, 101 S.W.3d at 775.

28:
Holley v. Adams
, 544 S.W.2d 367, 371–72 (Tex. 1976).  

29:
C.H
., 89 S.W.3d at 27.

30:
Id.
  

31:
Id.
 

32:
See, e.g.
, 
In re D.S.
, 176 S.W.3d 873, 879 (Tex. App.—Fort Worth 2005, no pet.) (holding that evidence of a parent’s long-term drug use can support a fact-finder’s conclusion that termination is in the child’s best interest), 
superseded by statute on other grounds as recognized in In re D.A.R.
, 201 S.W.3d 229, 230 (Tex. App.—Fort Worth 2006, no pet.); 
In re C.A.J.
, 122 S.W.3d 888, 893–94 (Tex. App.—Fort Worth 2003, no pet.) (noting that a parent’s continuous drug use poses an emotional and physical danger to a child now and in the future); 
In re J.R.
, 991 S.W.2d 318, 322 (Tex. App.—Fort Worth 1999, no pet.) (noting evidence of abuse and neglect included children’s exposure to domestic violence).

33:
See C.S.C.
, 2006 WL 3438185, at *7.

34:
Evidence about placement plans and adoption are relevant to best interest, but the lack of evidence about definitive plans for permanent placement is not dispositive.  
C.H.
, 89 S.W.3d at 28.

35:
See In re S.B.
, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (holding that evidence of a parent’s failure to comply with her family service plan supports a finding that termination is in the best interest of the child).

36:
Cf. C.S.C.
, 2006 WL 3438185, at *9 (noting that appellant’s own actions caused her to be put in detention centers and hospitals and therefore not complete her service plan).

37:
See 
C.H.
, 89 S.W.3d at 25. 

38:
See supra
 notes 25–26.