**In the Interest of J.R. and C.T.**

No. 2–98–304–CV.

Court of Appeals of Texas,
Fort Worth.

April 1, 1999.

Panel F: DAUPHINOT, RICHARDS, and BRIGHAM, JJ.

## OPINION

LEE ANN DAUPHINOT, Justice.

### INTRODUCTION

A.T. appeals from the trial court's judgment terminating the parent-child relationship between her and two of her children, J.R. and C.T.[1] On appeal, A.T. contends that the evidence is legally and factually insufficient to support the trial court's findings that she: (1) knowingly placed or allowed the children to remain in conditions or surroundings that endangered their emotional or physical well-being; or (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. Additionally, she argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship is in the best interest of the children. Because we determine that sufficient evidence supports the trial court's finding that A.T. knowingly placed or allowed the children to remain in conditions or surroundings that endangered their emotional or physical well-being and the trial court's finding that termination of the parent-child relationship is in the children's best interest, we overrule A.T.'s points and affirm the trial court's judgment.

### STANDARD OF REVIEW

A parent's rights to "the companionship, care, custody and management" of their children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). In a termination case, the State seeks not just to limit those rights

Tim Curry, Criminal Dist. Atty., Charles M. Mallin, Helena F. Faulkner, Nancy Dewees, Asst. Dist. Attys., Fort Worth, for appellee.

Wilson & White, L.L.P., Christina S. Glenn, Fort Worth, for ad litem.

1. J.T. and M.H., two of A.T.'s other children, were originally subjects of this suit, but were killed in an automobile accident. The trial court's judgment terminated A.T.'s rights to any inheritance, or wrongful death claims, regarding them. A.T. does not challenge this ruling on appeal.

but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. *See* TEX. FAM. CODE ANN. § 161.206(b) (Vernon 1996); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985).

■ In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001 (Vernon Supp.1999); *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *See Texas Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987).

■ Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." TEX. FAM. CODE ANN. § 161.206(a) (Vernon 1996). This standard is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994). This is an intermediate standard that falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *See State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979). While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *See id.* Termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent. *See Holick,* 685 S.W.2d at 20–21; *In re A.V.,*

849 S.W.2d 393, 400 (Tex.App.—Fort Worth 1993, no writ).

■ This higher burden of proof in the trial court does not alter the appellate standard of review for factual sufficiency. *See Faram v. Gervitz–Faram,* 895 S.W.2d 839, 843 (Tex.App.—Fort Worth 1995, no writ) (rejecting the "intermediate standard of appellate review" in cases involving the clear-and-convincing burden of proof). Accordingly, to prevail on an assertion that the evidence supporting the termination of parental rights is "factually insufficient," the evidence supporting the finding must be so weak or the evidence to the contrary must be so overwhelming that the finding should be set aside and a new trial ordered. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998).

■ A nonexclusive list of factors that serve as guidelines for triers of fact to determine the best interest of the child in termination cases includes:

(1) The desires of the child and the emotional and physical needs of the child now and in the future;

(2) the emotional and physical danger to the child now and in the future;

(3) the parental abilities of the individual seeking custody, and the programs available to assist this individual to promote the best interest of the child;

(4) the plans for the child by the individual seeking custody, and the stability of the proposed home;

(5) the acts or omissions of the parents that may indicate that the existing parent-child relationship is not a proper one; and

(6) any excuse for the acts or omissions of the parents.

*See Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976).

## EVIDENCE AT TRIAL

■ On November 10, 1996, A.T. brought C.T., who was four years old, to the emergency room. Dr. Charles Mann examined C.T. and discovered that a ligature had been tied around C.T.'s penis. Mann stated that the ligature had been there for ten to fourteen days and that it had been placed there by an adult. The entire tip of C.T.'s penis beyond the ligature was dead and barely attached. Mann testified that C.T. would have been in extreme agony for at least three or four days, until the ligature cut through C.T.'s urethra, allowing him to urinate, and until all of the nerve endings in the tip of the penis died. Mann removed the end of C.T.'s penis. Mann testified that C.T.'s penis was mutilated, that no realistic possibility of reconstructive surgery existed, and that the remaining portion of C.T.'s penis would never look normal or have normal sensation. Mann stated that due to the amount of pain the child had been in, his caregivers would have had to ignore the situation until it was too late.

Dr. Jan Leah Lamb also testified. Lamb is a pediatrician with Cook Children's Hospital and program director for the CARE Team child abuse evaluation unit. Lamb stated C.T.'s physical pain would have initially been extreme and C.T. would have suffered emotionally. Lamb also testified that C.T.'s injuries "spanned" the categories of child abuse and neglect.

Kathy Baczynski, C.T.'s therapist, testified that C.T. told her that Chuy Hernandez, A.T.'s live-in boyfriend, had tied the string around his penis because Hernandez was angry with him for urinating in the bathtub. C.T. said that A.T. had been there when Hernandez put the string on his penis. In addition to Baczynski, C.T. told Dr. Mary Ann Cotton, his psychologist, that everyone, including A.T. and his grandmother, knew about the string and had tried to remove it. J.R. also told Baczynski that she had witnessed Hernandez tie the string around C.T.'s penis.

A.T. was the children's primary caregiver. Both at the hospital and at trial, she said that she did not know about the string on C.T.'s penis, had not noticed him in pain, and had not noticed the injury until the day she took him to the hospital. A.T. maintained that, at four years old, C.T. was old enough to bathe, dress, and go to the bathroom unsupervised.

Lamb testified that A.T.'s failure to notice C.T.'s condition was "extreme neglect," because a part of his body was rotting away and because the child had been in extreme pain. Lamb testified that a four-year-old should never be left alone to bathe and that A.T. could not have missed C.T.'s injury if she ever saw him naked. Likewise, Mann testified that there was "[a] hundred percent" likelihood that an attentive caregiver would have noticed the child's injury.

In addition to C.T.'s injury, Child Protective Services (CPS) had received a previous referral for physical neglect of C.T. and J.R., alleging that the children were dirty, hungry, and unsure of when they had eaten. CPS specialist Cynthia Tranquilli learned that the children went to daycare dirty and that the daycare staff had spoken to A.T. about their condition, but the situation had not improved. Tranquilli testified that, when she spoke with A.T., she denied the allegations of neglect and said that the children, who were four and five, were old enough to wash and dress themselves. When Tranquilli visited A.T.'s home, the house was dirty. The carpet and everything in the house smelled of urine, dirt was ground into the carpet, the children's beds had no sheets or pillowcases, and clothes smelling of urine were piled throughout the house. After the first referral, A.T. signed a safety plan that required her to assist the children with bathing and washing their hair and to sign a release for the children's medical records.[2] A.T. acknowledged that she had failed to follow through with the plan's requirements.

2. There was evidence at trial that CPS was concerned about the condition of A.T.'s

Other evidence at trial established that A.T. and Hernandez had a violent relationship and that the children had been exposed to domestic violence. C.T. told Cotton that A.T. and Hernandez struck the children and each other, yelled, and used profane language. Baczynski referred C.T. to a child psychiatrist because C.T.'s anger and aggression escalated as the child dealt with what had happened to him. C.T. was diagnosed with depression, attention deficit disorder, and post-traumatic stress disorder and placed on medication.

Baczynski and Cotton also treated J.R. Baczynski testified that J.R. remained superficial, passive, and would not speak or make eye contact. Cotton testified that J.R. is a caring child but as times could be aggressive, defiant, and non-compliant. Baczynski attributed J.R.'s emotional problems to her seeing C.T. be injured, knowing he was hospitalized, and being frustrated at being placed in a home "where the mom could be a mom and she was a little girl." Additionally, Lamb testified that all of A.T.'s children had a flat affect, which was likely caused by their exposure to violence. Lamb testified that the children were "a pretty classic presentation for children [who] are close in age living in a fairly neglectful, chaotic environment." Eventually, both children were moved from basic foster care to therapeutic foster care and were progressing well at the time of trial.

Both A.T. and her mother testified that A.T. took the children to the hospital when A.T. saw something was wrong. A.T. denied placing the string on C.T.'s penis or knowing that it was there. She stated that she took C.T. to the hospital as soon as she saw the string on his penis. She denied noticing that C.T. was in pain. A.T. stated

that she fed her children and did their laundry. She also said that she and Hernandez did not fight. However, she testified that if she and Hernandez were not in jail at the time of trial she would not live with him because "of what's going on now" and she did not know whether he had hurt C.T.

Based on the above, we conclude that the evidence before the trial court was both legally and factually sufficient to support the trial court's finding that A.T. knowingly placed or allowed the children to remain in conditions or surroundings that endangered their emotional or physical well-being and that termination is in the best interest of the children. *See* Tex. Fam.Code Ann. § 161.001(1)(D) and (2) (Vernon Supp.1999).[3] We overrule A.T.'s points.

## CONCLUSION

Having overruled each of A.T.'s points, we affirm the trial court's judgment.

---

youngest child, M.H., who had been diagnosed with non-organic failure to thrive when she was three and a half months old. Non-organic failure to thrive is caused by improper feeding and constitutes neglect. However, A.T. claimed that she had not noticed that M.H. had gained less than two pounds since her birth.

**3.** Thus, we need not address whether there is also legally and factually sufficient evidence to support the trial court's finding, under section 161.001(E) that A.T. engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children.