

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00392-CV

IN THE INTEREST OF N.R., S.A.-R.,
AND A.A.-R., CHILDREN

----------

## FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant M.R. (Mother) appeals the termination of her parental rights to her children N.R. (Nicolas), S.A.-R. (Sophia), and A.A.-R. (Alexandra),[2] arguing that there is insufficient evidence to show that termination is in the children's best interests. We will affirm the trial court's judgment.

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for all of the children throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

## II. Factual and Procedural Background

The Department of Family and Protective Services (DFPS) received its first referral alleging physical abuse by the father of the children, E.A. (Father), on July 26, 2005. About a year later, on August 29, 2006, DFPS received a second referral for physical abuse. DFPS sent the case to Family-Based Social Services (FBSS) and Catholic Charities and DFPS offered services in an effort to keep the family intact. DFPS was called again on March 20, 2007, May 31, 2008, and October 20, 2008. These investigations were disposed of as either unable to determine or ruled out. In June of 2008, Father was convicted of assaulting Mother in May 2008.

By late 2008, Mother was living with F.B. (Boyfriend), who was twenty years her senior. Boyfriend has a long criminal history, including three felony convictions for burglary, one conviction for assault and bodily injury to a woman, two convictions for carrying an unlawful weapon, and one felony conviction of injury to a child. DFPS again visited Mother and the children on December 29, 2008. The DFPS worker noted that the children were not receiving appropriate medical care. Medical records established that all three children had staph infections, scabies, and boils. The DFPS worker also noted that Mother allowed the children to play in the street unsupervised. The DFPS worker found reason to believe that Mother was negligent in supervision, medical care, and physical neglect.

DFPS opened an Intensive Family Based Social Services case in March 2009.  Both Mother and Boyfriend failed to complete any of the services offered, which included parenting classes, anger management, random drug testing, and family counseling.  Mother attended some counseling sessions, but stopped because Boyfriend accused her of having an affair.  Mother refused to allow the children to attend daycare and refused to seriously address the cycle of violence her children had been observing.  DFPS workers observed Boyfriend verbally abusing Mother in front of the workers and the children.

Mother and Boyfriend moved to a motel during the FBSS investigation.  They moved to four different motel rooms during the investigation, often not telling investigators that they had moved.  The motel room that the family was living in was filthy.  Boyfriend made the children sleep on the floor with dog feces and urine.  The FBSS worker, Jennifer Crawford, testified that she offered Mother housing through DFPS but that Mother refused the housing because Boyfriend would not be allowed to live with her because of his criminal background.

In October 2009, Crawford took Mother and the children to Wal-Mart to buy the children some clothes.  Mother had no car seats in the car, and the children were standing up in the back seat.  Mother was unable to control the children in the store.  Nicolas repeatedly ran away and hit Crawford.  The store asked Mother to leave because the children were so disruptive.  Crawford tried to get Nicolas evaluated at a psychiatric hospital, but Mother refused, explaining that her pastor was going to "pray the demon behavior out of him."

3

On October 23, 2009, DFPS attempted a family team meeting with Mother, Boyfriend, Father, and Mother's sister. Boyfriend did not attend the meeting. Mother refused to place the children with her. DFPS then went to the motel to take possession of the children. A DFPS worker noticed spots on Sophia's back, which the worker realized were scabies. The children had scratched themselves so severely that the wounds had become infected, and they had permanent scars. The children were taken to the hospital, where it was also discovered that they had lice. Once the children's infections were treated multiple times, they were put in foster care. When initially placed in foster care, Nicolas was defecating in the closets, smearing feces on the walls, and urinating on the floor "every other day." Alexandra, who was two at the time of removal, would have tantrums, use foul language, and show her middle finger. She would bang her head and throw things, and if mad, urinate under her bed.

DFPS filed its petition for termination on October 26, 2009. A bench trial was held on September 13 and 20, 2010. The trial court found by clear and convincing evidence that Mother (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being; and that termination of the parent-child

4

relationship is in the children's best interest.[3]  *See* Tex. Fam. Code Ann. §

161.001(1)(D), (E), (2) (Vernon Supp. 2010).  The trial court appointed DFPS as

the permanent managing conservator of all three children.  This appeal followed.

### III.  Sufficiency of the Evidence

Mother does not complain about the sufficiency of the evidence to support

the trial court's findings that she violated subsections (D) and (E) of section

161.001(1).  Instead, she limits her appeal to the sufficiency of the evidence to

support the trial court's finding that termination of her parental rights is in

Nicolas's, Sophia's, and Alexandra's best interests.

### A.  Standard of review

A parent's rights to "the companionship, care, custody, and management"

of his or her children are constitutional interests "far more precious than any

property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388,

1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  "While parental rights

are of constitutional magnitude, they are not absolute.  Just as it is imperative for

courts to recognize the constitutional underpinnings of the parent-child

relationship, it is also essential that emotional and physical interests of the child

not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26

(Tex. 2002).  In a termination case, the State seeks not just to limit parental rights

but to erase them permanently—to divest the parent and child of all legal rights,

---

[3]The trial court's order also terminated Father's rights, but he did not appeal the judgment.

privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see id*. § 161.206(a). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were

proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness-credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

7

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.,* 209 S.W.3d at 116. Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the

presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Termination was in the children's best interests

Nicolas, Sophia, and Alexandra suffered severe psychological damage from their time living with Mother. *See* Tex. Fam. Code Ann. § 263.307(b)(1), (3)–(4), (6). Both Nicolas and Sophia have been diagnosed with Attention Deficit Hyperactivity Disorder, and Sophia and Alexandra have been diagnosed with Adjustment Disorder. Nicolas has also been diagnosed with Oppositional/Defiant Disorder. The children have witnessed years of domestic violence and drug abuse. *See id*. § 263.307(b)(7), (8). Nicolas was very aggressive, and he talked about monsters living in his closet. Alexandra told the children's counselor that Boyfriend hit Mother, hit her, and then "she began to hit herself in the face." Sophia told the counselor that "Grandpa" pulled Mother's hair and that Sophia cried behind the bed.

Although Mother testified that she was no longer with Boyfriend, there was also testimony that Mother and Boyfriend had been seen together. A social worker for Catholic Charities testified that "all the indicators, all the traits" of Boyfriend being a sociopath "were there." *See id*. § 263.307(b)(6). Boyfriend was verbally and physically abusive to Mother, once injuring her so badly she went to the hospital. *See id*. § 263.307(b)(7). Boyfriend had no regard for the return of the children. He was verbally abusive to Mother in front of the children on "numerous" occasions. He used drugs in front of the children and told DFPS

10

workers that he would smoke marijuana in front of the caseworkers and there is nothing DFPS can do about it. *See id*. § 263.307(b)(8), (10)–(11). Nicolas had "explicit knowledge" of marijuana including how to roll a marijuana cigarette. Boyfriend refused to comply with any of the services offered to him. He made appointments for counseling but never showed up or called to cancel.

Mother testified that she has part-time employment with Boyfriend's former employer. The case worker, Shawna Lewis, testified that Mother is not putting the needs of her children first because she has not separated herself from the people that Boyfriend associates with. There was much testimony that Mother repeatedly refused to put her children's needs before the needs and wants of Boyfriend. Despite being told that she would not get her children back if she continued to live with Boyfriend, by her own testimony she did not leave him for another eight or nine months. *See id*. § 263.307(b)(11). She told DFPS workers that there were no problems with her lifestyle and that even though she missed her children, she "regret[ted] nothing at all." She told workers that she intended to stay with Boyfriend, get married, and "fix up a home." *See id*. § 263.307(b)(12)(C)–(E).

Mother did not meet the children's basic health needs. *See id*. § 263.307(b)(12)(A). The children were living in a squalid motel room and were forced to sleep on a floor covered with animal feces. They had scabies that had been untreated for so long that the children suffered from infected sores and permanent scarring. They had staph infections, lice, and boils.

11

Nicolas needs a number of daily medications, and Mother testified that she would make sure he got them. But the children had suffered from diseases before that had gone untreated. Their scabies had gone untreated and led to permanent scarring. They also had no medical attention for their staph infections, which resulted from their unclean conditions. Mother had also previously refused to have Nicolas evaluated at a psychiatric hospital because a pastor "was going to pray the demon behavior out of him." The trial court could have believed that, based on her past failures to give her children medicine, Mother would not be able to provide Nicolas with his daily medications. *See id*. § 63.307(b)(12)(A), (F).

Mother did not know how or refused to discipline her children. *See id*. § 263.307(b)(12)(B). She "does not believe in disciplining her children" and stated to her doctor, "Discipline and rules are not me." Crawford witnessed such misbehavior at Wal-Mart that the store asked them to leave, and a DFPS worker stated that Mother "acts like she doesn't know how to raise children." During visitation, Mother did not "redirect" the children's bad behavior. Lewis explained, "She would attempt one time to tell the children what to do, and then they would continue and she would continue on and forget about it and let them do what they wanted." She appeared unable to handle them when they acted out.

Mother testified that she is now living in a stable home with Boyfriend's sister Leticia. She testified that Leticia and Boyfriend do not get along and that Boyfriend is not allowed at Leticia's house. The DFPS conservatorship (CVS)

12

worker testified that Leticia's home was "not appropriate" for the children and that Leticia has a history with CPS. She testified that it was "absolutely not" in the children's best interest to be taken out of foster care and put in Leticia's home.

Mother has not shown that she wants or is able to protect the children from her violent boyfriends. *See id.* § 263.307(b)(4), (9)–(11), (12)(C)-(E). Mother admitted that she consciously made the decision not to go to a women's shelter to escape Boyfriend's abusive behavior. She testified this was because she heard that her children would be taken away from her if she moved to a shelter. Instead, she chose to keep the children in squalid conditions with an abusive mate. *See In re J.R.*, 991 S.W.2d 318, 322 (Tex. App.—Fort Worth 1999, no pet.) (noting evidence of abuse and neglect included children's exposure to domestic violence). She testified that it "hit her" that she needed to leave the abusive relationship right after her children were removed and that the domestic violence counseling she received helped her, yet she stayed with Boyfriend for another eight or nine months. Although she testified that she did apply for housing through DFPS but never received a housing voucher, there was much testimony that Mother had stated that she would not leave Boyfriend.

She claimed that she did not complete her domestic violence counseling because she did not have transportation but that she did have transportation now through Leticia. However, there was no evidence that she had made any attempt to re-engage in counseling since moving in with Leticia. Constance Burdick, the social worker with Catholic Charities, testified that it takes "a lot of work" and

13

"many years" of counseling for battered women to deal with their issues. She believed the "damage done to [Mother]'s emotional well-being is extensive." Mother was supposed to have twelve counseling sessions with Burdick but only went to six. Burdick believed that more sessions would be necessary for Mother to deal with her abuse. As of March 2010 (the last time Burdick saw Mother and six months before trial), Burdick did not believe Mother was capable of rehabilitation. She testified that because of the state Mother was in at the time she stopped coming to therapy, it was "absolutely not safe" for the children to be returned to her.

Mother does not have an adequate social support system. *See* Tex. Fam. Code Ann. § 263.307(b)(13). Mother told her doctor that her family had "disowned" her because she would not reconcile with Father. At one time, Mother's sister had offered to take the children, but Mother refused to make the decision to place her children with her sister. The sister subsequently became pregnant and felt that she could not then take the children. Mother receives a lot of emotional support from Leticia, but as stated above, CPS feels that Leticia's home is not appropriate for the children. While Mother may not currently have a boyfriend, Mother relies greatly on men to support her, and she has a long history of being with violent partners. The doctor who performed Mother's psychological evaluation described her as immature with issues about relationships and dependency on others. *See id*. § 263.307(b)(6). He stated that

14

Mother "has poor insight into her children's developmental, emotional and behavioral needs." *See id*. § 263.307(b)(12)(F).

Mother failed to meet practically every goal that DFPS set for her. *See id*. § 263.307(b)(10), (11). She was set up with counseling at a women's shelter, but she did not go. She was set up with parenting classes, which she did not attend. She did not go to her Counseling Addiction Treatment Services assessment or two of the four court-ordered drug tests. Of the two drug tests she did complete, she tested positive for marijuana both times. She stopped going to counseling because Boyfriend accused her of having an affair. Mother did complete her Homemaker Services and attended "just about" every visitation with her children. However, she did not meet her goals of showing her ability to parent and protect the children, maintaining a drug-free and sober lifestyle, attaining a domestic-violence-free environment, or demonstrating her ability to provide basic necessities for the children. *See In re S.B*., 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (holding that evidence of a parent's failure to comply with her family service plan supports a finding that termination is in the best interest of the child).

While Mother argues that she changed a lot in the months leading up to trial, she has exhibited years of damaging behavior and has not completed any treatment to supply her with the tools to care for herself or her children. The trial court could believe that there was a serious concern that Mother would fall victim to another abusive relationship and expose the children to more violence. *See In*

15

*re J.D.B.*, No. 02-06-00451-CV, 2007 WL 2216612, at \*3 (Tex. App.—Fort Worth Aug. 2, 2007, no pet.) (mem. op.) (noting that a factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent); *In re C.S.C.*, No. 02-06-00254-CV, 2006 WL 3438185, at \*7 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.) (same).

The children had been in foster care for over a year at the time of trial. *See* Tex. Fam. Code Ann. § 263.307(b)(2). They have been with the same foster family since December 2009. The children regressed when they were first placed, but they have improved since. The foster parents provide a structured environment, and they are capable of providing the care and services the children need, including their basic needs and their emotional and mental needs.

The foster parents have agreed to foster them until they are adopted. Many of the children's behavioral issues have improved since living in foster care. Before his foster parents put him on medication, Nicolas would defecate in the closet, smear feces on walls, and urinate on the floor "every other day." The CVS worker testified that he is a "different child since they put him on medication." Now he is compliant and listens to his foster parents. When first placed in foster care, Alexandra would "flip you off," use profanity, throw tantrums, bang her head on the walls, and urinate and defecate on the floor. She is no longer urinating on the floor and her tantrums are not as long. Sophia was very anxious but now has a lot more tolerance for difficulty. Because they have

16

improved so much since being in foster care, Lewis believes all of the children are adoptable.

Giving due consideration to evidence that the trial court could have found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Mother's parental rights would be in the children's best interests. Accordingly, we hold that there was sufficient evidence to support the trial court's best-interest finding. We overrule Mother's issue.

## IV. Conclusion

Having overruled Mother's sole issue, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL: GARDNER, WALKER, and GABRIEL JJ.

DELIVERED: May 12, 2011

17