02-10-392-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00392-CV

 

 


 
 
 In the Interest of N.R., S.A.-R., and A.A.-R.,
 Children
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

 

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

I. 
Introduction

Appellant
M.R. (Mother) appeals the termination of her parental rights to her children N.R.
(Nicolas), S.A.-R. (Sophia), and A.A.-R. (Alexandra),[2] arguing that there is insufficient
evidence to show that termination is in the children’s best interests.  We will
affirm the trial court’s judgment.

II.  Factual and Procedural Background

The
Department of Family and Protective Services (DFPS) received its first referral
alleging physical abuse by the father of the children, E.A. (Father), on July
26, 2005.  About a year later, on August 29, 2006, DFPS received a second
referral for physical abuse.  DFPS sent the case to Family-Based Social
Services (FBSS) and Catholic Charities and DFPS offered services in an effort
to keep the family intact.  DFPS was called again on March 20, 2007, May 31,
2008, and October 20, 2008.  These investigations were disposed of as either
unable to determine or ruled out.  In June of 2008, Father was convicted of
assaulting Mother in May 2008.

By
late 2008, Mother was living with F.B. (Boyfriend), who was twenty years her
senior.  Boyfriend has a long criminal history, including three felony
convictions for burglary, one conviction for assault and bodily injury to a
woman, two convictions for carrying an unlawful weapon, and one felony
conviction of injury to a child.  DFPS again visited Mother and the children on
December 29, 2008.  The DFPS worker noted that the children were not receiving
appropriate medical care.  Medical records established that all three children
had staph infections, scabies, and boils.  The DFPS worker also noted that
Mother allowed the children to play in the street unsupervised.  The DFPS worker
found reason to believe that Mother was negligent in supervision, medical care,
and physical neglect.

          DFPS
opened an Intensive Family Based Social Services case in March 2009.  Both
Mother and Boyfriend failed to complete any of the services offered, which
included parenting classes, anger management, random drug testing, and family
counseling.  Mother attended some counseling sessions, but stopped because Boyfriend
accused her of having an affair.  Mother refused to allow the children to
attend daycare and refused to seriously address the cycle of violence her
children had been observing.  DFPS workers observed Boyfriend verbally abusing
Mother in front of the workers and the children.

          Mother
and Boyfriend moved to a motel during the FBSS investigation.  They moved to
four different motel rooms during the investigation, often not telling
investigators that they had moved.  The motel room that the family was living
in was filthy.  Boyfriend made the children sleep on the floor with dog feces
and urine.  The FBSS worker, Jennifer Crawford, testified that she offered
Mother housing through DFPS but that Mother refused the housing because
Boyfriend would not be allowed to live with her because of his criminal
background.

          In
October 2009, Crawford took Mother and the children to Wal-Mart to buy the
children some clothes.  Mother had no car seats in the car, and the children
were standing up in the back seat.  Mother was unable to control the children
in the store.  Nicolas repeatedly ran away and hit Crawford.  The store asked
Mother to leave because the children were so disruptive.  Crawford tried to get
Nicolas evaluated at a psychiatric hospital, but Mother refused, explaining
that her pastor was going to “pray the demon behavior out of him.”

On
October 23, 2009, DFPS attempted a family team meeting with Mother, Boyfriend,
Father, and Mother’s sister.  Boyfriend did not attend the meeting.  Mother
refused to place the children with her.  DFPS then went to the motel to take
possession of the children.  A DFPS worker noticed spots on Sophia’s back,
which the worker realized were scabies.  The children had scratched themselves
so severely that the wounds had become infected, and they had permanent scars. 
The children were taken to the hospital, where it was also discovered that they
had lice.  Once the children’s infections were treated multiple times, they
were put in foster care.  When initially placed in foster care, Nicolas was defecating
in the closets, smearing feces on the walls, and urinating on the floor “every
other day.”  Alexandra, who was two at the time of removal, would have
tantrums, use foul language, and show her middle finger.  She would bang her
head and throw things, and if mad, urinate under her bed.

DFPS
filed its petition for termination on October 26, 2009.  A bench trial was held
on September 13 and 20, 2010.  The trial court found by clear and convincing
evidence that Mother (1) knowingly placed or knowingly allowed the children to
remain in conditions or surroundings that endangered their physical or
emotional well-being, and (2) engaged in conduct or knowingly placed the
children with persons who engaged in conduct that endangered the children’s
physical or emotional well-being; and that termination of the parent-child
relationship is in the children’s best interest.[3]  See Tex. Fam.
Code Ann. § 161.001(1)(D), (E), (2) (Vernon Supp. 2010).  The trial court
appointed DFPS as the permanent managing conservator of all three children.  This
appeal followed.

III.
 Sufficiency of the Evidence

Mother
does not complain about the sufficiency of the evidence to support the trial
court’s findings that she violated subsections (D) and (E) of section
161.001(1).  Instead, she limits her appeal to the sufficiency of the evidence
to support the trial court’s finding that termination of her parental rights is
in Nicolas’s, Sophia’s, and Alexandra’s best interests.

A.  Standard
of review

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex.
Fam. Code Ann. § 161.206(b) (Vernon 2008); Holick v. Smith, 685 S.W.2d
18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and
strictly construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re M.C.T., 250 S.W.3d 161, 167 (Tex. App.—Fort
Worth 2008, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In re J.L.,
163 S.W.3d 79, 84 (Tex. 2005).  Termination decisions must be supported by
clear and convincing evidence.  Tex. Fam. Code Ann. § 161.001; see id.
§ 161.206(a).  Evidence is clear and convincing if it “will produce in the mind
of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.”  Id. § 101.007 (Vernon
2008).  Due process demands this heightened standard because termination
results in permanent, irrevocable changes for the parent and child.  In re
J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J., 243
S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).

In
reviewing the evidence for legal sufficiency in parental termination cases, we
must determine whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that the grounds for termination were proven. 
In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the factfinder resolved any disputed facts
in favor of its finding if a reasonable factfinder could have done so.  Id. 
We must also disregard all evidence that a reasonable factfinder could have
disbelieved.  Id.  We must consider, however, undisputed evidence even
if it is contrary to the finding.  Id.  That is, we must consider
evidence favorable to termination if a reasonable factfinder could, and
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
must therefore consider all of the evidence, not just that which favors the
verdict.  Id.  But we cannot weigh witness-credibility issues that
depend on the appearance and demeanor of the witnesses, for that is the
factfinder’s province.  Id. at 573, 574.  And even when credibility
issues appear in the appellate record, we must defer to the factfinder’s determinations
as long as they are not unreasonable.  Id. at 573.

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (Vernon
2008).  The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1) the child’s age
and physical and mental vulnerabilities;

 

(2) the frequency and
nature of out-of-home placements;

 

(3) the magnitude,
frequency, and circumstances of the harm to the child;

 

(4) whether the child
has been the victim of repeated harm after the initial report and intervention
by the department or other agency;

 

(5) whether the child
is fearful of living in or returning to the child’s home;

 

(6) the results of
psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

 

(7) whether there is
a history of abusive or assaultive conduct by the child’s family or others who
have access to the child’s home;

 

(8) whether there is
a history of substance abuse by the child’s family or others who have access to
the child’s home;

 

(9) whether the
perpetrator of the harm to the child is identified;

 

(10) the willingness
and ability of the child’s family to seek out, accept, and complete counseling
services and to cooperate with and facilitate an appropriate agency’s close
supervision;

 

(11) the willingness
and ability of the child’s family to effect positive environmental and personal
changes within a reasonable period of time;

 

(12) whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:

 

(A) minimally
adequate health and nutritional care;

 

(B) care, nurturance,
and appropriate discipline consistent with the child’s physical and
psychological development;

 

(C) guidance and
supervision consistent with the child’s safety;

 

(D) a safe physical
home environment;

 

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the child; and

 

(F) an understanding
of the child’s needs and capabilities; and

 

(13) whether an
adequate social support system consisting of an extended family and friends is
available to the child.

 

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.  Other, nonexclusive factors that the trier of
fact in a termination case may use in determining the best interest of the
child include: (1) the desires of the child; (2) the emotional and physical
needs of the child now and in the future; (3) the emotional and physical danger
to the child now and in the future; (4) the parental abilities of the
individuals seeking custody; (5) the programs available to assist these
individuals to promote the best interest of the child; (6) the plans for the
child by these individuals or by the agency seeking custody; (7) the stability
of the home or proposed placement; (8) the acts or omissions of the parent
which may indicate that the existing parent-child relationship is not a proper
one; and (9) any excuse for the acts or omissions of the parent.  Holley v.
Adams, 544 S.W.2d 367, 371–72 (Tex. 1976).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

B. 
Termination was in the children’s best interests

          Nicolas,
Sophia, and Alexandra suffered severe psychological damage from their time living
with Mother.  See Tex. Fam. Code Ann. § 263.307(b)(1), (3)–(4),
(6).  Both Nicolas and Sophia have been diagnosed with Attention Deficit
Hyperactivity Disorder, and Sophia and Alexandra have been diagnosed with
Adjustment Disorder.  Nicolas has also been diagnosed with Oppositional/Defiant
Disorder.  The children have witnessed years of domestic violence and drug
abuse.  See id. § 263.307(b)(7), (8).  Nicolas was very
aggressive, and he talked about monsters living in his closet.  Alexandra told
the children’s counselor that Boyfriend hit Mother, hit her, and then “she
began to hit herself in the face.”  Sophia told the counselor that “Grandpa” pulled
Mother’s hair and that Sophia cried behind the bed.

Although
Mother testified that she was no longer with Boyfriend, there was also
testimony that Mother and Boyfriend had been seen together.  A social worker
for Catholic Charities testified that “all the indicators, all the traits” of
Boyfriend being a sociopath “were there.”  See id. § 263.307(b)(6).
 Boyfriend was verbally and physically abusive to Mother, once injuring her so
badly she went to the hospital.  See id. § 263.307(b)(7).  Boyfriend
had no regard for the return of the children.  He was verbally abusive to
Mother in front of the children on “numerous” occasions.  He used drugs in
front of the children and told DFPS workers that he would smoke marijuana in
front of the caseworkers and there is nothing DFPS can do about it.  See
id. § 263.307(b)(8), (10)–(11).  Nicolas had “explicit knowledge”
of marijuana including how to roll a marijuana cigarette.  Boyfriend refused to
comply with any of the services offered to him.  He made appointments for
counseling but never showed up or called to cancel.

Mother
testified that she has part-time employment with Boyfriend’s former employer.  The
case worker, Shawna Lewis, testified that Mother is not putting the needs of
her children first because she has not separated herself from the people that Boyfriend
associates with.  There was much testimony that Mother repeatedly refused to
put her children’s needs before the needs and wants of Boyfriend.  Despite
being told that she would not get her children back if she continued to live
with Boyfriend, by her own testimony she did not leave him for another eight or
nine months.  See id. § 263.307(b)(11).  She told DFPS
workers that there were no problems with her lifestyle and that even though she
missed her children, she “regret[ted] nothing at all.”  She told workers that
she intended to stay with Boyfriend, get married, and “fix up a home.”  See
id. § 263.307(b)(12) (C)–(E).

Mother
did not meet the children’s basic health needs.  See id. § 263.307(b)(12)(A). 
The children were living in a squalid motel room and were forced to sleep on a
floor covered with animal feces.  They had scabies that had been untreated for
so long that the children suffered from infected sores and permanent scarring. 
They had staph infections, lice, and boils.

Nicolas
needs a number of daily medications, and Mother testified that she would make
sure he got them.  But the children had suffered from diseases before that had
gone untreated.  Their scabies had gone untreated and led to permanent
scarring.  They also had no medical attention for their staph infections, which
resulted from their unclean conditions.  Mother had also previously refused to
have Nicolas evaluated at a psychiatric hospital because a pastor “was going to
pray the demon behavior out of him.”  The trial court could have believed that,
based on her past failures to give her children medicine, Mother would not be
able to provide Nicolas with his daily medications.  See id. § 63.307(b)(12)(A),
(F).

Mother
did not know how or refused to discipline her children.  See id.
§ 263.307(b)(12)(B).  She “does not believe in disciplining her children”
and stated to her doctor, “Discipline and rules are not me.”  Crawford
witnessed such misbehavior at Wal-Mart that the store asked them to leave, and
a DFPS worker stated that Mother “acts like she doesn’t know how to raise
children.”  During visitation, Mother did not “redirect” the children’s bad
behavior.  Lewis explained, “She would attempt one time to tell the children
what to do, and then they would continue and she would continue on and forget
about it and let them do what they wanted.”  She appeared unable to handle them
when they acted out.

Mother
testified that she is now living in a stable home with Boyfriend’s sister Leticia. 
She testified that Leticia and Boyfriend do not get along and that Boyfriend is
not allowed at Leticia’s house.  The DFPS conservatorship (CVS) worker
testified that Leticia’s home was “not appropriate” for the children and that
Leticia has a history with CPS.  She testified that it was “absolutely not” in
the children’s best interest to be taken out of foster care and put in
Leticia’s home.

Mother
has not shown that she wants or is able to protect the children from her
violent boyfriends.  See id. § 263.307(b)(4), (9)–(11), (12)(C)-(E). 
Mother admitted that she consciously made the decision not to go to a women’s
shelter to escape Boyfriend’s abusive behavior.  She testified this was because
she heard that her children would be taken away from her if she moved to a
shelter.  Instead, she chose to keep the children in squalid conditions with an
abusive mate.  See In re J.R., 991 S.W.2d 318, 322 (Tex.
App.—Fort Worth 1999, no pet.) (noting evidence of abuse and neglect included
children's exposure to domestic violence).  She testified that it “hit her”
that she needed to leave the abusive relationship right after her children were
removed and that the domestic violence counseling she received helped her, yet
she stayed with Boyfriend for another eight or nine months.  Although she
testified that she did apply for housing through DFPS but never received a
housing voucher, there was much testimony that Mother had stated that she would
not leave Boyfriend.

She
claimed that she did not complete her domestic violence counseling because she
did not have transportation but that she did have transportation now through Leticia. 
However, there was no evidence that she had made any attempt to re-engage in
counseling since moving in with Leticia.  Constance Burdick, the social worker
with Catholic Charities, testified that it takes “a lot of work” and “many
years” of counseling for battered women to deal with their issues.  She
believed the “damage done to [Mother]’s emotional well-being is extensive.” 
Mother was supposed to have twelve counseling sessions with Burdick but only
went to six.  Burdick believed that more sessions would be necessary for Mother
to deal with her abuse.  As of March 2010 (the last time Burdick saw Mother and
six months before trial), Burdick did not believe Mother was capable of rehabilitation. 
She testified that because of the state Mother was in at the time she stopped
coming to therapy, it was “absolutely not safe” for the children to be returned
to her.

Mother
does not have an adequate social support system.  See Tex. Fam. Code
Ann. § 263.307(b)(13).  Mother told her doctor that her family had
“disowned” her because she would not reconcile with Father.  At one time,
Mother’s sister had offered to take the children, but Mother refused to make
the decision to place her children with her sister.  The sister subsequently
became pregnant and felt that she could not then take the children.  Mother
receives a lot of emotional support from Leticia, but as stated above, CPS
feels that Leticia’s home is not appropriate for the children.  While Mother
may not currently have a boyfriend, Mother relies greatly on men to support her,
and she has a long history of being with violent partners.  The doctor who
performed Mother’s psychological evaluation described her as immature with
issues about relationships and dependency on others.  See id.
§ 263.307(b)(6).  He stated that Mother “has poor insight into her
children’s developmental, emotional and behavioral needs.”  See id.
§ 263.307(b)(12)(F).

Mother
failed to meet practically every goal that DFPS set for her.  See id.
§ 263.307(b)(10), (11).  She was set up with counseling at a women’s
shelter, but she did not go.  She was set up with parenting classes, which she
did not attend.  She did not go to her Counseling Addiction Treatment Services
assessment or two of the four court-ordered drug tests.  Of the two drug tests
she did complete, she tested positive for marijuana both times.  She stopped
going to counseling because Boyfriend accused her of having an affair.  Mother
did complete her Homemaker Services and attended “just about” every visitation
with her children.  However, she did not meet her goals of showing her ability
to parent and protect the children, maintaining a drug-free and sober
lifestyle, attaining a domestic-violence-free environment, or demonstrating her
ability to provide basic necessities for the children.  See In re S.B.,
207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (holding that
evidence of a parent's failure to comply with her family service plan supports
a finding that termination is in the best interest of the child).

While
Mother argues that she changed a lot in the months leading up to trial, she has
exhibited years of damaging behavior and has not completed any treatment to
supply her with the tools to care for herself or her children.  The trial court
could believe that there was a serious concern that Mother would fall victim to
another abusive relationship and expose the children to more violence.  See In
re J.D.B., No. 02-06-00451-CV, 2007 WL 2216612, at *3 (Tex. App.—Fort Worth
Aug. 2, 2007, no pet.) (mem. op.) (noting that a factfinder may infer that past
conduct endangering the well-being of a child may recur in the future if the
child is returned to the parent); In re C.S.C., No. 02-06-00254-CV, 2006
WL 3438185, at *7 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.)
(same).

The
children had been in foster care for over a year at the time of trial.  See
Tex. Fam. Code Ann. § 263.307(b)(2).  They have been with the same foster
family since December 2009.  The children regressed when they were first
placed, but they have improved since.  The foster parents provide a structured
environment, and they are capable of providing the care and services the
children need, including their basic needs and their emotional and mental
needs.

The foster
parents have agreed to foster them until they are adopted.  Many of the
children’s behavioral issues have improved since living in foster care.  Before
his foster parents put him on medication, Nicolas would defecate in the closet,
smear feces on walls, and urinate on the floor “every other day.”  The CVS
worker testified that he is a “different child since they put him on
medication.”  Now he is compliant and listens to his foster parents.  When
first placed in foster care, Alexandra would “flip you off,” use profanity,
throw tantrums, bang her head on the walls, and urinate and defecate on the
floor.  She is no longer urinating on the floor and her tantrums are not as
long.  Sophia was very anxious but now has a lot more tolerance for difficulty.
 Because they have improved so much since being in foster care, Lewis believes
all of the children are adoptable.

Giving
due consideration to evidence that the trial court could have found to be clear
and convincing, and based on our review of the entire record, we hold that a
reasonable trier of fact could have formed a firm belief or conviction that the
termination of Mother’s parental rights would be in the children’s best
interests.  Accordingly, we hold that there was sufficient evidence to support
the trial court’s best-interest finding.  We overrule Mother’s issue.

IV.  Conclusion

Having
overruled Mother’s sole issue, we affirm the trial court’s judgment.

 

 

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
GARDNER,
WALKER, and GABRIEL JJ.

 

DELIVERED:  May 12, 2011









[1]See Tex. R. App. P. 47.4.





[2]We use aliases for all of
the children throughout this opinion.  See Tex. R. App. P. 9.8(b)(2).





[3]The trial court’s order
also terminated Father’s rights, but he did not appeal the judgment.